James W. **COYLE**, Plaintiff,

v.

John W. **GARDNER**, Secretary of Health, Education and Welfare, Defendant.

Civ. No. 2779.

United States District Court
D. Hawaii.

Feb. 27, 1969.

Gerald W. Grimes, Honolulu, Hawaii (Hogan, Howell & Rother, Honolulu, Hawaii, of counsel), for plaintiff.

Michael David Hong, Asst. U. S. Atty., Yoshimi Hayashi, U. S. Atty., District of Hawaii, for defendant.

## DECISION

TAVARES, District Judge.

In this decision references to the record ("R. 18" etc.) refer to pages of the record in this district court, whereas references to transcript ("Tr. 78" etc.) refer to the certified copy of the transcript of the record, including the evidence upon which the findings and decision complained of are based, which was filed in this court by the defendant, as required by section 205(g) of the Social Security Act, 42 U.S.C.A. § 405 (g).[1]

The following statement of the case made in defendant's brief (R. 18–19) and accepted by the plaintiff in his brief (R. 36), is adopted by the Court.

This action was brought under section 205(g) of the Social Security Act, hereinafter called the Act, 42 U.S.C.A. § 405 (g), to review a final decision of the Secretary of Health, Education, and Welfare disallowing plaintiff's application for the establishment of a period of disability and for disability insurance benefits under sections 216(i) and 223 of the Act, 42 U.S.C.A. §§ 416(i), 423.

The plaintiff filed an application for a period of disability and for disability insurance benefits on April 27, 1965 (Tr. 64–67), alleging that he became unable to work on May 4 or 5, 1954, at age 31. The application was denied initially (Tr. 71–72) and on reconsideration (Tr. 78–80) by the Bureau of Disability Insurance of the Social Security Administration, after the Hawaii Division of Vocational Rehabilitation, upon evaluation of the evidence by a physician and a disability examiner, had found that the plaintiff was not under a disability (Tr. 74–77).

The plaintiff had previously filed applications for disability benefits on October 10, 1955, and November 3, 1960, alleging that he became disabled on May 5, 1954 (Tr. 50–52, 56–59). These applications were denied on initial determination by the Bureau of Old Age and Survivors Insurance, and the plaintiff did not request reconsideration. These decisions thus became the final decisions of the Secretary on these earlier applications which are not before this Court on this review of the Secretary's decision of September 29, 1967. 20 C.F.R. § 404.908.

Having carefully examined the transcript and the applicable law, this Court believes that the plaintiff is entitled to relief in this action.

The defendant contends that the jurisdiction of this Court is limited to the question of whether or not the findings of the Secretary of Health, Education and Welfare are supported by substantial evidence. However, the transcript of the examiner's hearing (Tr. 16–46) indicates that a more fundamental question of basic fairness of the hearing is involved before we even reach

---

1. This section reads in part as follows:
  "Any individual, after any final decision of the Secretary made after a hearing to which he was a party * * * may obtain a review of such decision by a civil action * * * in the district court of the United States * * *. As part of his answer the Secretary shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based. The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing. The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive. * * * *"

the question of support of the findings by substantial evidence.

The hearing before the examiner held on May 24, 1967, at Honolulu, Hawaii, involved facts and events that happened during a period of 13 years, extending back to 1954. The plaintiff, a part-Hawaiian, with only a first year high school education, appeared before the examiner with his wife, also a part-Hawaiian.[2]

Adequate preparation for a proper presentation of this involved matter covering testimony by two simple, scantily-educated witnesses, would well have justified many hours of study by a

skilled attorney, so as to bring out the facts in their proper sequence and significance. The transcript makes it obvious that neither plaintiff nor his wife had made any such preparation, not even by refreshing their memories from the exhibits produced by the examiner and intended by him to be offered in evidence. Since plaintiff and his wife were thus obviously unprepared, unskilled and ignorant of the significance of the facts, such a situation called for the examiner, in the position of both inquisitor and judge, to be extra careful to see that all relevant facts and circumstances,[3] both *favorable* and unfavorable, to plaintiff, be brought out,[4] just as, when a

2. The wife was the holder of a Hawaiian Homes Commission residence lease of ¾ acre. Under the Hawaiian Homes Commission Act 1920, 48 U.S.C.A. § 692(a) (7) any holder of a tract of Hawaiian Home Lands as lessee under the Hawaiian Homes Commission Act had to be a "native Hawaiian," which means of not less than one-half part of the blood of the races inhabiting the Hawaiian Islands previous to 1778.

3. "Hearings shall be open to the parties and to such other persons as the hearing examiner deems necessary and proper. The hearing examiner shall *inquire fully* into the matters at issue and shall receive in evidence the testimony of witnesses and any documents which are relevant and material to such matters. * * *" (emphasis added) 20 C.F.R. § 404.927.

4. To the extent not otherwise specially provided by the Social Security Act, the Administrative Procedure Act (5 U.S.C.A. § 500 et seq.) and specifically those portions thereof hereinafter mentioned, apply to this hearing. 5 U.S.C.A. § 559. Thus, although specific authorization for representation by an attorney is made by 5 U.S.C.A. § 500(b), subsection (d) of the same section provides:
"This section does not—
"(1) Grant or deny to an individual who is not qualified as provided by subsection (b) or (c) of this section the right to appear for or represent a person before an agency or in an agency proceeding; * * *."
5 U.S.C.A. § 552(a) (1) (C) requires each agency to publish in the Federal Register, for the guidance of the public, rules of civil procedure, and subsection (b) of section 555 states:

"(b) A person compelled to appear in person before an agency or representative thereof is entitled to be accompanied, represented, and advised by counsel or, if permitted by the agency, by other qualified representative. * * * This subsection does not grant or deny a person who is not a lawyer the right to appear for or represent others before an agency or in an agency proceeding."
5 U.S.C.A. § 556(b) provides:
"* * * The functions of presiding employees and of employees participating in decisions in accordance with section 557 of this title shall be conducted *in an impartial manner.* * * *" (Emphasis added.)
Subsection (e) of the same section provides:
"The transcript of testimony and exhibits, together with all papers and requests filed in the proceeding, constitutes the conclusive record for decision in accordance with section 557 of this title * * *."
Pursuant to said section 552(a) (1) (C) the Civil Procedure rules applicable to this type of hearing, as to representation, have been published and the Court specifically refers to 20 C.F.R. Sections 404.971 to 404.973, inclusive (also published as "Appendix—Regulations" in Title 42 U.S.C.A. § 2501 to end, reading as follows:
"20 CFR § 404.971—Representation of party—Appointment of representative. A party in an action leading to an initial or reconsidered determination, hearing, or review, as provided in §§ 404.-905 to 404.963, inclusive, may appoint as his representative in any such proceeding only an individual who is qualified under § 404.972 to act as a representative. Where the individual ap-

party appears in court unrepresented by counsel, it is the Court's duty to attempt to see that all the facts are fairly presented.

At the outset the examiner went through the motions of ostensibly informing the claimant, Coyle, of his right to be represented by a lawyer or other qualified representative. The statement and conversation was as follows (Tr. 17–18). First the examiner pointed out to Mr. Coyle that on the back of the Notice of Hearing there was a paragraph that had to do with representation:

"It says that although it is not required, you may be represented by a lawyer or other qualified person if you so desire. Did you understand about that?

"CLAIMANT: Yes."

On the face of it, this would seem an adequate explanation of plaintiff's right, but the subsequent conversation indicates *that plaintiff did not really understand* his rights to representation. Thus, the questioning went on as follows: (Tr. 17–18)

"Q. Do you want to have any representative? *You don't have to have.*" (emphasis added to indicate how, with this and subsequent statements,

plaintiff was subtly persuaded to proceed without any representation, even by his own wife).

"A. Well, I don't have any money to get any representative.

"Q. Well, *is that what you are telling me, that you want to go ahead without a representative?* Is that what you are saying?

"A. Well, the wife could do it." (Emphasis added.)

If anything, Coyle was expressing a need for help here, and a desire to have his wife act as his representative, or at least to assist him. But what did the examiner do? He immediately discouraged such assistance, by saying:

"Q. Is she going to act as your attorney or be your witness to tell me about you? Is she going to represent you and act for you? Is that what you want?"

The witness again indicated his ignorance of what the examiner was driving at, by answering:

"A. Well, she knows more about—"

Without permitting claimant to even finish his sentence, the examiner interrupted:

"Q. You mean you want her to tell me about your—"

---

pointed by a party to represent him is not an attorney, written notice of the appointment must be given, signed by the party appointing the representative, and accepted by the representative appointed. The notice of appointment shall be filed at an office of the Administration, with a hearing examiner, or with the Appeals Council of the Administration, as the case may be. Where the representative appointed is an attorney, in the absence of information to the contrary, his representation that he has such authority shall be accepted as evidence of the attorney's authority to represent a party."
"§ 404.972—Qualifications of representative.
"(a) Attorney. * * *
"(b) Person other than attorney. Any person (other than an attorney described in paragraph (a) of this sec-

tion) who (1) is of good character, in good repute, and has the necessary qualifications to enable him to render valuable assistance to an individual in connection with his claim, (2) has not been disqualified or suspended from acting as a representative in proceedings before the Social Security Administration, and (3) is not, pursuant to any provision of law, otherwise prohibited from acting as a representative, may be appointed as a representative in accordance with § 404.971."
"§ 404.973—Authority of representative.
" * * * A representative shall be entitled to present or elicit evidence and allegations as to facts and law in any proceeding affecting the party he represents and to obtain information with respect to the claim of such party to the same extent as such party. * * *"

And here again the examiner does not even finish *his explanation*, and the witness answers:

"That's right."

What the witness is thus corroborating is certainly not clear, yet the examiner continues:

"Q. Well, *that is not being a representative. That is being a witness.*

"A. A witness?

"Q. *She can be your witness. I will be glad to hear from her, but a representative or an attorney would be acting for you. Did you want to have any representative or do you want to handle your case yourself?*

"A. *I'm a little mixed up.*" (Emphasis added.)

No reasonable person could fail to see that the claimant was utterly confused. Then, to compound the confusion, the examiner proceeds:

"Q. You know that an attorney, for instance, would come, and he could *take action for you without your knowledge. * * *"* (Emphasis added.)

That statement would tend to frighten an ignorant man with only a ninth-grade education from wanting to proceed any further with a representative who would be *acting without his knowledge.* The examiner continues:

"He could do various things as your representative *because he would have full authority to act for you.* Now you don't have to have any such person but you may if you wish; *or you can represent yourself—you can handle your own case. Your wife can be a witness. * * *"* (Emphasis added.)

Here the examiner is saying, in effect, that the wife can *only* be a witness, but *can not assist him* or *be a representative for him*—that he must choose one or the other. The examiner continues:

"If you want her to be a witness, I think it would be well if we would ask her some questions but what I want to know now is if you want to handle your own case here today. It is perfectly all right if you want to. I just want to make sure that you understand.

"A. Yes."

Reading the entire colloquy up to that point makes it clear that the witness did not really know what the examiner was driving at, but that, as an affable Hawaiian trying to be agreeable to authority, he accepted what the examiner had said without really understanding it. To continue, quoting from the transcript:

"MRS. COYLE: May I speak for him, please?

"HEARING EXAMINER: You mean now?

"MRS. COYLE: Yes, in a representative—

"HEARING EXAMINER: Do you want to be his representative?

"MRS. COYLE: No, represent his own self.

"HEARING EXAMINER: Is that all right with you, Mr. Coyle?

"CLAIMANT: Yes."

Mrs. Coyle, having in effect been previously told by the examiner's previous remarks that she was eligible to be a witness, but not a "representative," could hardly have said anything else; and plaintiff likewise.

It is evident to this Court from this colloquy, the preceding questions and answers, and the whole transcript, that Mrs. Coyle herself was not a well-educated person, that she did not understand the proceedings any more than Mr. Coyle did, but apparently had a somewhat better memory, and that, had she been allowed to sit by him and assist him, she could well have helped straighten out some of the facts which he failed to remember, remembered imperfectly, or explained incompletely.

The record only shows Mrs. Coyle's desire to be helpful to her husband, which the examiner peremptorily discouraged. In fact, when Mrs. Coyle stated that "knowing him so well I think

I know him better than the doctor.", (Tr. 45), the examiner, instead of attempting to explore the significance of this claim *by the one person who could know Coyle* better than any doctor, simply says, "Possibly so," (Tr. 45) and *then when Mrs. Coyle tries to explain why her husband is really unemployable,* does not even allow her to finish, and *interrupts her* to ask when she moved to her present place (Tr. 45).

The examiner attempted near the beginning of the hearing (Tr. 19–21), but *after* he had made plaintiff and his wife understand that the wife could be a witness but not a representative, as above stated, to state the previous history of the case, and the issues and other technical aspects of the case. Any person acquainted with the average Hawaiian having the education indicated by either Mr. or Mrs. Coyle, would know that a great deal of the explanation would not be understandable to them. As a matter of fact, even a lawyer would find it difficult to understand all of the ramifications of the complicated statute, regulations, and procedure involved.

Incidentally, in the middle of the explanation, Mrs. Coyle evidenced difficulty in hearing what was going on, and asked to bring her chair up closer, which the hearing examiner permitted her to do, until he finished his explanation. After proceeding with further explanation, with technical and numerous three and four-syllable words (Tr. 20–21), the examiner then proceeded to secure the applicant's permission to file *42 exhibits!* Although the examiner first went off the record to permit Mr. Coyle to examine the 42 exhibits and to decide whether to object to the admission of any of them, no specific time is shown by the record as to how long it took Mr. Coyle to examine these 42 documents. But some indication of the haste of the examiner in getting those exhibits in (and the obvious failure of the plaintiff to even read them—thereby refreshing his memory, if he could read some of the almost undecipherable hand-

writing, much less understand the exhibits) can be found from the fact that the hearing opened at 11:00 a.m. on May 24, 1967, and closed at 12:40 p.m., a period of one hour and 40 minutes. It would have taken longer than that just to read the 42 exhibits, even disregarding the poor handwriting. But this is not all: having, as this Court views it, by subtle suggestion or peremptory direction, discouraged Mr. Coyle from having his wife represent him, or be present to help him, and in spite of the fact *that both Mr. and Mrs. Coyle had asked that she be present at his questioning,* the examiner, after having gotten all the exhibits he desired into evidence, says this (R. 22):

> "Q. Then I think we are ready to take your testimony, and I think *while we are hearing from you, I will ask that your wife be seated outside* and we will call you back when we need you. Is that all right with you? Did you answer 'Yes'." (emphasis added)
>
> "A. Yes.
>
> Mrs. Coyle leaves hearing room."

Thus, after having *excluded* Mrs. Coyle, the examiner proceeds to question Mr. Coyle *alone.*

█ This type of tactics by a supposedly impartial examiner, who should have known by then that these parties who were not represented by counsel, needed help—even the little help each of them could give the other mutually—in this Court's view was so arbitrary (especially when considered in the light of the zeal with which this examiner sought to bring out every fact detrimental to plantiff in his and his wife's testimony, and drew every possible inference against the plaintiff), as to constitute a denial of due process.

█ In trials of both civil and criminal cases, the actual exclusion of witnesses is largely discretionary and is not exercised unless one party expressly invokes the rule; even in criminal cases the Government is permitted to have one of its principal lay witnesses present to

sit at counsel's table and advise counsel on the facts. But this supposedly unbiased examiner peremptorily excluded the wife, in spite of the clearly conveyed desire of both plaintiff and his wife that she be present to help and advise him.

Laudable as the examiner's attempt to shorten the proceedings and save money for the government might otherwise appear to be, this hardly comports with our present-day ideas of fairness in a hearing, administrative or judicial, where a party is not represented by counsel, and the same person is both inquisitor and judge.

An example of the biased manner in which the hearing was held, as far as plaintiff's side is concerned, occurs on page 24 of the transcript. The examiner (evidently unacquainted with the Hawaiian Homes Commission Act 1920), after getting the address in Nanakuli (which, by the way, is about 30 miles from the centers of urban activity where jobs could normally be expected to be available), asks:

"Q. Now, how much property do you have there?

"A. It's three quarters of an acre. It's Hawaiian Homesteads.

"Q. In order to get title did you have to do some work on the place? Did you have to clear it or do something to get the homestead rights?

"A. No, the wife filed (sic) in an application and we were called in to (inaudible) so the Commissioners called us and asked us if we wanted to (inaudible) the place.

"Q. I see."

Aside from the imperfections of this transcript, the very form of the question, seeking to bring out that plaintiff *had to work* to get title to the place, is typical of the examiner's attitude throughout. Title to the Hawaiian Homes Commission lease of the houselot (99 years at $1 per year) was in the wife.[5]

The testimony of Mr. Coyle then follows, indicating that the leased land accepted contained an old home, which was

---

5. The Hawaiian Homes Commission Act. 1920, 48 U.S.C.A. § 699, states that "Available lands shall be sold or leased only (1) in the manner and for the purposes set out in section 691–704 and 705–716 of this title, * * *."
And then Section 701 provides:
"(a) The Commission is authorized to lease to native Hawaiians the right to the use and occupancy of a tract or tracts of Hawaiian home lands within the following acreage limits per each lessee: * * * (4) not more than one acre of any class of land to be used as a residence lot: *Provided, however,* That, in the case of any existing lease of a farm lot * * *."
Section 702 of the same Title provides that:
"Each lease made under the authority granted the Commission by the provisions of section 701 of this title and the tract in respect to which the lease is made, shall be deemed subject to the following conditions, whether or not stipulated in the lease:
"(1) The original lessee shall be a native Hawaiian not less than twenty-one years of age * * *.
"(2) The lessee shall pay a rental of $1 a year for the tract and the lease shall be for a term of ninety-nine years;

"(3) The lessee shall *occupy and commence to use or cultivate* the tract *as his home* or farm within one year after the lease is made. * * *

"(4) The lessee shall thereafter, for at least such part of each year as the Commission shall by regulation prescribe, so occupy and use or cultivate the tract on his own behalf; * * *." (Emphasis added.)

Then follow other provisions restricting the right of any lessee to mortgage or lease or sell his or her interest in the land, requiring that the lessee perform such other conditions as the Commission may stipulate in the lease: providing for a five-year exemption from real property taxes from date of lease, etc. A reading of the whole Act will indicate that the *cultivation* feature refers to the *farm lots* which are covered by other provisions of the Act not applicable here. Thus, in this case, as the Court can and does take judicial notice in this jurisdiction, there was no requirement of any substantial nature as to clearing or cultivating the land in order to get title. One must only use it as a home within one year of the grant of the lease.

remodeled to fit the needs of their large family—which was already on relief.

Then the examiner proceeds to question Mr. Coyle as to whether he has ever done any *other* work and elicits the fact that Mr. Coyle did service station work in Maile, part time:

"A. That was in '57 if I'm not mistaken. They did call me in Saturdays or Sundays or whenever the boss wanted a day off. * * *"

After the examiner points out that the record indicates that in *1956* plaintiff was credited with earnings of $166.88, the witness, having his memory thus refreshed, admits that this probably happened in about October to December, *1956*.

This small amount of $166.88 earnings over a three-month period certainly bears out plaintiff's claim of availability only of part-time work, and only over week-ends or on special occasions. That this type of evidence as to availability of only occasional or part-time work does not prove his ability to engage in substantial gainful activity is—especially when the only previous experience and training of plaintiff was being in the army, where he advanced to Sergeant in charge of a group handling heavy construction equipment, and

thereafter as a civilian working as a truck driver, general heavy-duty mechanic and oiler (Tr. 6), all heavy work— is clearly established by the authorities cited in plaintiff's brief, including the following cases:

Berry vs. U. S., 312 U.S. 450 [61 S.Ct. 637, 85 L.Ed. 945] (1941);

Meola vs. Ribicoff, 207 F.Supp. 658 (D.C.S.N.Y.1962);

Pollak vs. Ribicoff, 300 F.2d 674 (2d Cir. 1962);

Popovich vs. Celebrezze, 220 F.Supp. 205 (D.C.W.Pa.1963);

Austin vs. Celebrezze, 230 F.Supp. 256 (D.C.S.Texas 1964);

McClain vs. Gardner, 253 F.Supp. 559 (D.C.S.C.1966);

Spivak vs. Gardner, 268 F.Supp. 366 (D.C. E.N.Y. 1966);

Leftwich vs. Gardner, 377 F.2d 287 (4th Cir. 1967);

Brandon v. Gardner, 377 F.2d 488 (4th Cir. 1967);

In this connection it is not even shown whether in each case plaintiff worked all day or just part of a day at a time, or what his rate of pay was.

The examiner then probed plaintiff's working part-time in *1965*, tending fish tanks.[6]

---

6. Plaintiff testified:
"Q. Well, didn't you work in 1965 part-time cleaning fishtanks?
"A. I tried—I started to.
* * * * *
"Q. Well, Exhibit 17, which is the Division of Vocational Rehabilitation case record for February 12, 1965, which says that you were working *part-time* since January '65, *five hours a day, five days last month, $1.25 an hour,* cleaning fish tanks, *and that it might be full-time if the owner got a new lease and expanded.*
* * * * *
"A. *I didn't go back after that because my back bothered me too much.*
"Q. Well, how long did you work there in '65.
"A. I worked—
"Q. *How many days did you go there?*

"A. *I tried to go every time I can. Other person picked me up and some days I worked an hour, two hours, sometimes I forced myself to put in five hours and then couldn't go back in the next day.*
"Q. Well, that doesn't tell me how much you worked. This is what I want to find out.
"A. (No answer).
"Q. *How many days or how many hours did you work altogether?*
"A. *I don't know. Maybe the wife can know.*
"Q. I'm asking you first. Can't you remember?
"A. *I don't remember.*
"Q. You have no idea how much you earned or how much you worked—how many days you worked? You can't remember?
"A. I can't remember.

The evidence of working in fishtanks, coupled with a report that he worked *only five days in one month* is what the examiner refers to in his decision as also indicating plaintiff's ability to engage in substantial gainful activity, when—if the witness's statement is taken at its face value (*and there is no credible evidence to contradict it*)—the witness proved he worked only part-time, on any one day, and not on consecutive days, that the job soon petered out, and that anyway he found himself *physically unable to do the work* in any steady manner. Moreover, there is no evidence that any other such jobs were available.

The witness then said he worked for "material" since 1954, on a chicken farm going out of business, at which he "tore down houses, chicken houses, and whatever lumber and material he wasn't taking with him, I got that, too." [7]

"Q. *Why did you quit?*
"A. *I didn't quit.*
"Q. *Well, why did you stop?* Did you do all the work there was for you?
"A. *I was helping a person—a friend of mine—and he told me not to—he wasn't going to pick me up any more. The boss said we were caught up with the work and they weren't going to do any more and they didn't need me.*
"Q. They didn't need you any more?
"A. *Whenever they need me they would get in touch with me.*
"Q. This fellow who picked you up, is this your friend?
"A. Yes, that's a friend of mine.
"Q. Did he work for this employer?
"A. Yes.
"Q. What did you do, cleaning fishtanks? What kind of fishtanks were these, first of all?
"A. *Concrete tanks and if they're cracked you have to clean them up—there's a lot of rubbish in there—and scrub them down.*
"Q. Did you have to get into the tank?
"A. In the tank.
"Q. Did you use a hose?
"A. *A water hose and scrub brush with steel brush—scrubbing the tanks and then the cracks were painted by this friend of mine—he taught me how to go around chipping and put the special cement, seal the tanks up.*
"Q. You sealed and cleaned the cracks—
"A. *That's right and it was all bending over and squatting down.*
"Q. You did all the work that they had for you?
"A. I tried my best to do everything whatever they had me do." (emphasis added) (Tr. 25–27).

**7.** Plaintiff testified:
"Q. I see. How much work did you do? How long a job was it? How many days did you go there to tear down these chicken houses?

"A. I'd go in about *every other day.*
"Q. For how long?
"A. *Four or five hours, as long as I could last* out there tearing down the buildings.
"Q. How long did this work last? How many weeks or months?
"A. *About six months.*
"Q. So you worked about six months every other day, is that it?
"A. *About four months.*
"Q. Why did you only work every other day?
"A. *I couldn't stand it.*
"Q. Were you doing your own work at your own place?
"A. No. Wasn't doing any work then. *I'd rest the next day trying to get out the next following—rest one day—work one day—get up, then rest one day, and try to get up and keep going. Some days I couldn't and then I'd have to return home. I'd work an hour and then I'd have to return home.*
"Q. Most of the time did you work for five hours a day when you went there?
"A. *That's right.*
" * * * *we* loaded up on a truck" (which the other man had) * * *. "*I drove the truck over to my place* * * * about two or three miles. * * * *I had the children when they come from school help me unload the lumber and material.*
"Q. *What did you build with this lumber and material?*
"A. *Chicken coops and duck pens, rabbit hutches.*
"Q. Do you raise chickens and ducks and rabbits, as I understand?
"A. I did. *And I had pigs, I had a couple pigs* but don't have—not raising pigs or rabbits any more.
"Q. *Did you sell any of this?*
"A. *No.*
"Q. Or was this all for home use?
"A. *All for home use.* The reason why I started the chicken farm to get some of the buildings and move them

It may be that inclement wheather on the mainland requires that chicken houses be of substantial construction, but anyone who knows the requirements for a chicken house in this year-round warm climate, knows the flimsy type of construction used. Dismantling and transporting by truck these light chicken-wire frames, and building at his home local types of chicken coops and pens for pigs, ducks, etc., would hardly indicate ability to engage in substantial gainful activity. Moreover, if dismantling chicken houses for leftover material can even be considered a job, there is a total lack of any evidence that paying jobs of this type were ever available anywhere on the Island. Of course, the Hawaiian Homes Commission Act, quoted ante, restricted the use of plaintiff's wife's houselot to residence and non-commercial purposes, which confirms the plaintiff's testimony.

The foregoing indicates the type of so-called "evidence" used by the examiner to reach his conclusions that during the eligibility period in question—up to June 30, 1959, the end of the last quarter in which claimant fulfilled the statutory eligibility requirement of having 20 quarters of coverage out of the 40 quarter period ending with the quarter in which the period of disability begins, which date is not in dispute (Tr. 6)—plaintiff was able to engage in a substantial gainful activity. Again, this Court agrees with the plaintiff's authorities cited ante, to the effect that *attempts* of this nature *to work which were unsuccessful* are *not evidence of employability or availability for even light employment*. In this connection this Court takes judicial notice of certain local conditions which should have been considered by the examiner, and which would have been clear from a mere view of the area, and which the plaintiff's testimony also demonstrates:

■ (1) In the flat plains of the Nanakuli area, the so-called "rocks" in most places would be smaller stones or pebbles, not of any substantial size or weight. Plaintiff's testimony that his "Dad and I and wife, sister-in-law and her husband and children" would go out on weekends and help and that "during the week, we'd do what we can, chopped down the brush and burn it," and that they would "Rake the ground and level it up, take the rocks and build a stone wall" and "We just used the rake and *raked the rocks * * *"* etc., shows that the so-called "rocks" were pebbles and stones small enough to be "raked." (Tr. 35).

■ (2) As to raising flowers, the evidence is that the flowers consisted of plumeria, a plant somewhat similar to the cactus family, which the Court can and does take judicial notice will often sprout from itself if a branch is just thrown on the ground, and which requires no "cultivation". The only mention of any flowers other than plumeria, in the evidence, so far as this Court can find, is the reported testimony of Mr. Coyle mentioning "cornflower":

"Q. Plant what, a garden?

&ast; &ast; &ast; &ast; &ast; &ast;

"A. Plumeria and cornflower—different plants." (Tr. 36).

■ (3) This Court knows that "cornflower" isn't used in Hawaii for making leis, if it is cultivated at all. The reporter obviously means "crown flower," defined in Webster's Third International Dictionary as "a large shrub (colotropis, gigantea) with white and pale lavender flowers used for leis in Hawaii." Evidently the examiner did not know or try

---

like that to start a chicken raising business but the *Hawaiian Homestead Commission wouldn't allow that.*

"*Q. Why not?*

"*A. They wouldn't allow anyone to go into* commercial business like I wanted to raise a frying chicken and they wouldn't allow me to do it but for home use you can raise animals there on your property."

(Tr. 28–29)

to find out how much work would be involved in planting such shrubs, which, like plumeria, do not have to be replanted every year, and do not need much, if any, "cultivation," once they start growing. On the other hand, Exhibit 17, a report by the Work Evaluation Team of the Department of Social Services of the State of Hawaii, much relied upon by the examiner in reaching his conclusions, states that (in March 1960) (Tr. 90):

"* * * More recently, since moving to Nanakuli, he has acquired a renewed interest in life including vocational as he is *reportedly* cleaned up the ¾ acre plot of land he acquired through the Hawaiian Homestead Commission. He wants to be a farmer raising poultry and *flowers for the lei* business." (Emphasis added; note again the fact that *Mrs. Coyle*, not Mr. Coyle, owned the houselot lease),

and that "plaintiff is using the homestead land in *planting plumeria* for the flowers that he hopes to sell" (emphasis added). Evidently the crownflowers or any other plants (if there were others, and the evidence shows none) were so insignificant as not to be worth mentioning in this report.

The Hearing Examiner's Decision, dated June 12, 1967, (Tr. 5) states, among other things:

"* * * On April 27, 1965 he filed his third application. The record in connection with his previous applications was reviewed; additional evidence was considered; and it was determined that his impairment was not of sufficient severity to preclude his engaging in substantial gainful activity at any time when he still met the statutory earnings requirement. * * *"

The Examiner's findings also include the following (Tr. 8):

"Upon consideration of the entire record, the Hearing Examiner finds, pursuant to sections 216(i) (1) and 223(c) (2) of the Social Security Act in effect prior to amendment in 1965 and as amended in 1965, that the claimant has not established that at any

time prior to July 1, 1959 he was under a 'disability', that is, unable to engage in *any* substantial gainful activity by reason of any medically determinable physical or mental impairment, or combination of impairments, which could be expected to be of long-continued and indefinite duration or which had lasted or could be expected to last for a continuous period of not less than 12 months. * * *"

█ As indicated in this decision, there is no substantial evidence to support these findings. Rather, the Court finds that the evidence clearly establishes exactly the contrary, from the entire record.

At Tr. 9 the examiner says:

"* * * The claimant's activities on his own *farm* in 1959 and 1960 *clearly demonstrate* his ability to engage in working activity. He played a *significant role* in cleaning up and improving the three-quarter acre plot. * * *" (Emphasis added.)

The "farm" *was not* "his own," it belonged to his wife; and it was *not a farm* —it was a houselot; and for the examiner to rely upon this so-called "farm" activity, along with others similarly flimsy indications such as: "Flowers were planted to be grown for sale," and the possibility that there would be a "fuller crop the next year," etc., as evidence of ability to engage in substantial gainful activity, is totally unjustifiable.

Exhibit 17 (Tr. 92) says that,

"Dr. Nadamoto states in his report that this man can work full time *on light work* but *not to stand or walk for prolonged periods and he is not to do any heavy lifting,* * * * Actually, Mr. Coyle has already started to do quite a bit of work on his own farm." (Emphasis added).

and that he was "*reportedly* working quite continuously in raising poultry and flowers" (emphasis added) and felt "better after working up a good sweat"; that as of August 31, 1960, he was able to do his work on his farm (Tr. 94); including pick and shovel work (Tr. 94); and that

as of January 30, 1961 (Tr. 95) it was thought he *should be able* to "tolerate" employment which requires standing and walking "about *half* of his walking time." (Emphasis added.)

Raising a few chickens, ducks, pigs and rabbits for home consumption is, again, hardly an indication of employability, especially when he had a wife and several children to help do these small, household chores, as indicated by the same Exhibit 17:

" * * * as his children are growing and they would be trained to do most of the chores around the place." (Tr. 93)

"He has children who should be able to help one way or another." (Tr. 94)

" * * * Several home visits were made during this period in order to evaluate his farm which included raising some poultry * * * The operation is on a small scale." (Emphasis added.) (Tr. 96);

"Working up a sweat" around home in the hot, humid Nanakuli weather, would be very easy and natural. As for the "pick and shovel work", even an in-

valid or cripple could engage in this occasionally, depending on how, and for how long he did it, the size and weight of the pick and shovel, and the kind of work done therewith, and still not be able to engage in substantial gainful employment at full time.

Exhibit 17 (Tr. 90) concerning "Personal & Family Background", contains no statement as to who made the report, indicates no cross-examination by the plaintiff, and no calling to Coyle's attention during the examination, of many of the statements therein until after the decision was rendered by the examiner; hence Coyle, ignorant of their significance, had no real opportunity to answer or explain many of the statements in Exhibit 17, which is so heavily relied upon by the examiner.

There are many reports and exhibits in the transcript which refer to the claimant's disabling physical and mental condition. The examiner mentions the disabilities in his report, but disregards every medical finding and every inference therefrom favorable to plaintiff, in order to reach a conclusion adverse to plaintiff's claim of disability.[8]

---

8. Thus, he reports (Tr. 7):

"Coming to the medical evidence, it is shown that in May 1954 the claimant sustained a severe strain of the low back for which he was treated conservatively. He had a series of hospital admissions, and in March 1955 myelography demonstrated a *ruptured disc* at the L5–S1 level. On *May 5, 1955 he underwent a laminectomy and fusion* and he was discharged from the hospital *in mid-July. His symptoms persisted*, and after X-rays revealed a pseudoarthrosis in the fused area, *he underwent surgery* on January 22, 1956, at which time an *L4–S2 fusion was done*. He was discharged from the hospital on March 4, 1956, ambulatory, *in a brace*, and in an improved condition.

"Thereafter, his symptoms of low back pain radiating into the right leg were *completely relieved.* * * *" (Emphasis added.)

The narrative summary of clinical record of Tripler Hospital says (Tr. 119):

(Tripler Hospital clinical record)

"The patient claims that following this surgery, [January 1956] the symptoms

of right leg pain and back pain *were completely relieved. However, shortly after surgery the patient noticed intermittent, dull cramping pains involving both legs from the thighs* to the ankles and *intermittent cramping pain in the low back* especially at night. These pains could be relieved by activity and movement. *These crampy pains have been intermittently persistent to date."* (Emphasis added.)

This finding, as indicated in this note, is made by taking *completely out of context* purported statements apparently made to the hospital physicians and purportedly recorded in Exhibit 29 (Tr. 119–120), and drawing therefrom a conclusion *completely contrary* to the total "evidence" shown by the *same* report in its entirety, especially the remainder of the same paragraph quoted above, which *negatives* any such general conclusion. To show how the examiner twisted the evidence and tried to justify such distortion, he adds (continuing Tr. 7):

" * * * However, when hospitalized on *January 7, 1958*, he complained of intermittent, dull cramping pains in

The examiner himself specifically finds (Tr. 6–7):

"* * * In the period 1956 to 1959 he sought work as a custodian in schools in Honolulu, but allegedly *was turned down* after being interviewed by various shcool principals *because of his low back condition.* * * * In the years 1960 to 1963 the claimant made various applications for jobs, including going to an oil refinery to ask *for any job available,* particularly that of guard or custodian. He also applied at service stations in his immediate area for work as attendant, *but all of his efforts were unsuccessful.*" (Emphasis added.)

Thus, using plaintiff's *unsuccessful* efforts to secure employment as evidence to show either ability to engage in substantial gainful employment, or availability of such jobs to him, is obviously a non-sequitur. In the face of the last mentioned findings, the examiner immediately goes on to say:

"It is well established that after moving to his present home the claimant *and members of his family worked together* cleaning up and clearing the land. This included *chopping down* and burning *brush,* clearing away rocks, and *building dry rock walls.* The claimant and others used rakes to smooth the ground, and eventually half to three-quarters of the property was sufficiently developed so that it could be cultivated. *Flowers were planted* to be grown for sale. The first sales were in 1965, and *this year* there was a *fuller crop* and increased sales. * * *" (Tr. 7) (Emphasis added.)

The examiner gives claimant no credit for trying in spite of his uncontradicted testimony as to his aches and pains, to clean up the houselot, but puts great reliance on the alleged facts that he "chopped down * * * brush," "cultivated" the land for raising flowers, "cleared rocks" (which really consisted of "raking small stones") etc., all of which, as shown ante, utterly fail to show ability to engage in substantial gainful activity.

Viewed in the light most favorable to defendant, plaintiff's alleged physical ability to hold a full-time job depended upon his being able to do "light work" (nowhere defined by the examiner or the evidence, and not shown by any evidence to have been available) while "standing and walking to the extent about *half of his walking time,*" and that "the *limitations* imposed by Dr. Nadamoto *on carrying should be observed.*" (Tr. 95—emphasis added.)

A caseworker reported regarding his findings for the period 1/16/61 to 3/4/63, and Dr. Nadamoto's views, as follows:

"After this case was transferred to me, contact was made with Mr. Coyle and in view of his *continuing complaint about pain in his back and cramps in his legs,* current evaluation was obtained through Dr. Nadamoto, Orthopedic Surgeon. Dr. Nadamoto indicated *disability* as post operative status, laminectomy and fusion from

both legs and in the low back. * * *" (Emphasis added.)

The same Exhibit 29 (Tr. 119) shows that plaintiff *was not* completely relieved of low back pain, but that he *told the physicians* on that *same occasion* that "shortly after surgery" he noticed dull, cramping pains involving both legs from the thighs to the ankles and intermittent cramping pain in the low back, especially at night. Yet the examiner clearly implies that these pains did not recur until "when hospitalized *on January 7, 1958.*" (Emphasis added.)

Exhibit 17 (Tr. 90), March 15, 1960, says that plaintiff is:

"a 37-year old Haole-Hawaiian who is married and has 2 stepsons and 4 other children from his present marriage. The family recently moved from the Mayor' Wright housing to Nanakuli. They are receiving welfare support of $293.00 a month as his workmen's compensation benefits expired sometime ago *and he has not been able to work since 1954.*" (Emphasis added.)

The examiner has thus used only those portions of the exhibits that support his conclusions, disregarding completely those portions of the same exhibits cited that are favorable to the claimant.

L4 to S1. He is restricted from lifting heavy objects *or any objects for sustained period of time*. Restrictions included the *lifting maximum of 10 lbs. for any length of time.* * * * when a job order appeared for a janitor at the Naval Air Station at Barbers Point. Mr. Coyle was referred to this job but *was not hired* after he told the employment office there that he is *unable to drive at night* because his eyes are bad and that he is *unable to lift or bend.* * * * indicating that the janitorial work there perhaps may be *beyond Mr. Coyle's ability. This job entails some heavy lifting.* * * * he began to complain of epileptic seizures once again.* * * * Indications, however, are that *a car is available* and he has been driving as I have seen a 1951 Chevy two-door sedan in his yard which he said was given to him by a relative. * * * treatment at Queen's OPC resulted in good control of his seizures so long he continues to take his medication. She said at this time that Mr. Coyle *fractured both ankles* recently and may be hospitalized shortly for continuing treatment. She said that *he also complained of a slip disc* which is affecting his arm movements. * * * " (Tr. 96–97; emphasis added.)

In the light of this man's work history, including actual or possible or suspected epileptic seizures—whether controlled or not by medication—; hysteria; back or spinal injuries and weaknesses; medically certified limitations on walking or standing more than half of his working time, or lifting more than ten pounds, or

lifting heavy objects; his doubtful ability to operate a motor vehicle safely either to himself or his employer; and other indications of disability in the transcript, this Court believes that no employer would hire this type of individual for any substantial time, if at all. The few instances of his working for an employer indicate that he was unable to hold any of the jobs full time for any substantial and consecutive period.[9] There is no substantial evidence as to the actual availablity of *any* full-time job or work opportunity that could, in the light of modern requirements for employment, be considered as within the very limited abilities of claimant as indicated by the transcript. Thus, whatever evidence there was indicated exactly the opposite of the conclusion reached by the examiner. The mere fact that the claimant applied unsuccessfully for various jobs, or tried unsuccessfuly to do various odd jobs, in spite of his disability, or did the part-time and occasional activities indicated herein or in the transcript, is not evidence, either that he was able to engage in substantial activity as defined by the authorities, or that jobs of the type that he could actually perform were available at any time, anywhere. (See authorities cited ante).

In this connection, the Court finds that the mere expressions of opinion by several physicians (all of the physicians who examined or treated this claimant being by no means unanimous on this point) that claimant was able to do light work or any work, are insufficient to substantiate such conclusion, in the absence of other evidence, and contrary to

---

9. In this connection the Court adopts the statement in claimant's brief, reading, in part, as follows:

 " * * * The claimant definitely did not present a prospective employer with a desirable combination of qualifications. In modern society, these matters must be taken into account. It is well known that employers are reluctant to hire people who have sustained any kind of industrial injury. Their reluctance is partially due to the effect on the employer's Workman's Compensation Insurance Premiums. Furthermore, it is

common knowledge that if the partial disability is in any way related to a low back injury, it is practically impossible for an individual to obtain work of any kind.

 "Clearly, this fact of modern-day life, together with the obvious fact that no person can prove a negative proposition, has led the courts to require the government to go forward with affirmative evidence of available work which the claimant can obtain. Such a determination cannot be based on speculation." (R. 53).

the uncontradicted direct testimony of both claimant and his wife. (See authorities cited ante.)

Last, but not least, this Court finds that the transcript conclusively indicates that all of the findings of medical and non-medical physicians and personnel of the federal or State authorities dealing with the present claimant's condition (other than Coyle and his wife, who testified consistently as to his inability to work because of his low back condition), are based wholly or in very substantial part, in the later demonstrated *clearly erroneous assumption that there had been complete fusion and alleviation of the low back condition* in the area L4–L5–S1. The later uncontradicted medical evidence conclusively shows that there were, during the years 1956–1965, several operations necessitated by *non-fusion* in that area, and that the low back condition *had not in fact* been alleviated and the *fusion had not* taken place, *even as late as the operation of December, 1965,* by Dr. Dodge.[10]

To this Court it seems clear that medical opinions rendered from 1956 to as late as the middle of 1965 were based on this demonstrated erroneous medical conclusion that there had been fusion. The findings of the examiner, which are obviously based on the earlier clearly erroneous and non-medical conclusions of physicians and investigators, unjustifiably disregard this later evidence.

For the foregoing reasons this Court finds that there is no substantial evidence to support the examiner's conclusions, and that the evidence, on the contrary, supports the plaintiff's contentions conclusively.

This Court could remand the case for a new or further hearing, but believes that this plaintiff has suffered enough from the errors of physicians, investigators and examiners, and should not be subjected to any further delay and frustration.

Therefore, pursuant to 42 U.S.C.A. § 405(g), it is ordered that judgment be entered, upon the pleadings and transcript of the record, reversing the decision of the Secretary, and in favor of the plaintiff.

The foregoing will constitute the court's findings of fact and conclusions of law.

A form of judgment in conformity with this decision will be prepared by plaintiff's counsel, submitted to defendant's counsel, with five days for approval as to form, and if there is objection as to the form, the Court will set a hearing for settlement of such form.

---

10. As to which it is stated:
    "The old longitudinal scar in the lower portion of the lumbar region was excised and soft tissues separated down to the bone and a very definite defect was found between the fifth lumbar vertebra and the sacrum which represented a non-union of the bone graft at that level. All the soft tissue was cleared as much as possible down to the spinal cord and the remaining bone fragments were freshened into free bleeding areas. The oval graft was then chipped into small pieces and utilized as a fresh bone graft along with artificial bank bone to re-establish continuity between the fifth lumbar vertebra and the sacrum. L4–5 appeared to be solid without difficulty. * * *" (Tr. 138)
    And see also Exhibit 38 (Tr. 139 to 141).